JOSEPH C. JOHNSON *v.* JOHN J. GHINGHER, RECEIVER

[No. 66, January Term, 1935.]

*Decided April 3rd, 1935.*

The cause was argued before BOND, C. J., URNER, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Isaac Lobe Straus,* with whom was *J. Paul Schmidt* on the brief, for the appellant.

*William D. Macmillan,* with whom was *John E. Semmes* on the brief, for the appellee.

PARKE, J., delivered the opinion of the Court.

Upon the bill of complaint of the State of Maryland against the Park Bank, an incorporated banking institution of the State of Maryland, and the answer of the defendant, the Circuit Court of Baltimore City appointed, on August 12th, 1932, the bank commissioner of Maryland the receiver for the bank, which was insolvent. In the process of its final liquidation, one Joseph C. Johnson filed a petition in the cause on April 17th, 1933, to be allowed, out of the funds in the possession of the receiver, a preference of $120,000, less a payment of $12,000 received by the petitioner from the Maryland Trust Company, trustee, on account of the indebtedness of the principal, the Park Mortgage & Ground Rent Company, on the notes for the $120,000 mentioned. After testimony taken and hearing of the parties concerned, the matter was submitted, and the chancellor decreed that the petitioner had neither a lien nor a preference, but was a common creditor of the bank. The appeal is from this decree.

The facts upon which the petitioner's claim of a preference or lien rests are not in controversy. The petitioner was a depositor of the bank, and had, in July, 1929, a sum in excess of $119,000 on deposit in a savings account. He was then approached by Webster Bell, the president of the bank, for the purpose of having the petitioner invest his saving funds in the collateral trust notes of the Park Mortgage & Ground Rent Company, a corporation engaged in real estate operations, with its place of business in the banking house of the Park Bank, of which it was a separate but subsidiary corporation, with the same presi-

dent, and with its directorate and executive officers practically identical with those of the bank. The notes of the company were of a series which were secured by a deed of trust granting and assigning certain mortgages as collateral, which the company had given the Maryland Trust Company to hold as trustee for the benefit of those who would purchase any of such notes.

Acting upon Bell's representations, the petitioner, on July 29th, 1929, made a deposit of $781.85 to the credit of his savings account so that his savings were increased to $120,038.47, with which he bought $120,000 of the company's collateral trust notes, dated July 31st, 1929, maturing one year after date with interest at six per cent. per annum, payable semi-annually in advance, and a commission of one per centum per annum on the principal amount to the purchaser. The petitioner made this investment upon the agreement that he should have the right to receive renewal notes for another year on the same terms, and, in anticipation, was paid the sum of $2,400 as his bonus or commissions for advancing the money for two years; and that the bank, at any time until the payment of the notes, would, upon the request of the petitioner, and a thirty days' notice, repurchase the notes at their full face value, and that the petitioner would, thereupon, refund to the bank the commissions received in the proportion of the unexpired part of the period of two years to the biennial period.

The transaction was effected by the petitioner giving his written order on the bank for the transfer of the funds of the petitioner in the savings accounts in the bank to the credit of the account in the bank of the Park Mortgage & Ground Rent Company; and, through the bank, the company made delivery of the company's certificates or notes, dated July 31st, 1929, in an aggregate amount of $120,000; of its check to petitioner for $3,600 in payment of six months' interest in advance; and of its check to petitioner for $2,400 for commissions at the rate of one per centum per annum on the amount of the loan for two years.

The petitioner, on February 3rd, 1930, gave the prescribed notice, and demanded that the bank purchase the collateral trust notes of $120,000, but Webster Bell, its president, by his representations of the solvency, safety, and excellent financial condition of the Park Bank and, also, of the Park Mortgage & Ground Rent Company, induced the petitioner to let his investment in the notes continue; and, again on January 13th, 1931, the petitioner repeated the notice and demand for the bank to take up the notes at their face value and interest, but by like representations was similarly prevailed upon by Webster Bell, the president of the bank, not to require the notes to be purchased by the bank. The third demand upon the Park Bank was made in June, 1931, as the petitioner had under consideration the embarking upon a business enterprise. In reply to this demand, the bank notified the petitioner that he should present his collateral notes to the Maryland Trust Company for payment on July 31st, 1931, or let the Park Bank have the notes for collection, and the bank would have them paid in cash. This suggestion was followed by the petitioner's acceptance of an invitation to meet the president of the bank in his private office. At this conference, the petitioner was urged not to venture in the contemplated business association, and the third party to the proposed undertaking was falsely represented to be undesirable and unreliable, and upon this misrepresentation and the further representation that the investments of both the bank and its subsidiary corporation were safe and secure, and that the Park Bank was solvent and capable of repurchasing and repaying the face value of the collateral trust notes, and would repurchase and repay the sum due on the notes on the petitioner's specified request and notice, the petitioner was again persuaded not to demand the payment of the notes of $120,000, which would fall due on the extended date of July 31st, 1931, but to surrender his three notes on that date for $120,000 of the company's collateral trust notes of a later and higher serial number.

The terms of the last mentioned agreement were embodied in a letter of the bank to the petitioner under date of July 31st, 1931. In this letter were inclosed the collateral trust notes, in the form of three certificates of the Park Mortgage & Ground Rent Company, of even date with the letter, and payable on July 31st, 1932, with interest at six per centum per annum. Two of the certificates were each for $50,000, and the third was for $20,000. In this letter the bank specifically promised that the petitioner should have the right to renew the obligations of the company for another year, with interest at six per centum yearly, so as to make the period two years, and that the company would pay the petitioner interest on these notes six months in advance, and that the bank agreed to repurchase these notes at face value, at any time during the ensuing two years of the petitioner's ownership, upon thirty days' notice to the bank. In addition, the bank forwarded by this communication a check of the company for $3,600 in discharge of the advance payment of interest for the first six months, and another check of the company "for $2,400 representing commissions at the rate of 1% per annum on $120,000 for the two years."

The fourth demand made by the petitioner of the bank to redeem these notes was in January, 1932, and again the bank, through its president, by means of similar representations, persuaded the petitioner to abandon his demand for the bank to repurchase the notes of the company. The investment situation of the petitioner remained unchanged until the month of July, 1932. The petitioner heard disquieting rumors of the unsound financial condition of the bank, and saw its president and was assured these rumors were unfounded, and that the bank and company were solvent and in excellent financial condition, but the petitioner, on July 26th, 1932, renewed his inquiry at the bank. On this occasion, the president of the bank again denied that the bank was insolvent or that its financial soundness was impaired, and prepared in his own hand a statement and calculation of the condition

of the bank that showed its capital stock, whose par value was $10, was worth $18.90 a share, and that its surplus was $623,000; and another statement and calculation of the company that represented its capital stock of $50 a share to be worth $69.40 a share, its surplus to be $255,-000, and its undivided profits to be $36,000. At the same time, the president of the bank gave to the petitioner 5,000 shares of the capital stock of the bank, which belonged to the Park Mortgage & Ground Rent Company, as collateral further to secure the plaintiff the repayment or purchase by the bank of the notes of the company, and the president stated to the petitioner that the stock of the bank was worth from $18 to $19 a share, although the president of the bank knew that both corporations were then irretrievably insolvent.

When the maturity date, according to the tenor of the notes, arrived, on July 31st, 1931, the bank did not pay to the petitioner the principal amount of the trust notes of the company, but, on August 2nd, caused to be issued to the petitioner other collateral trust notes of the company of new and later serial numbers, dated August 2nd, 1932, and payable on September 2nd, 1932. Two of these notes were each for $50,000, and the third was for $20,-000. At the time of the delivery of these last notes, the petitioner gave the bank notice in writing that, on the expiration of the thirty days for which the last renewal notes were given, the bank would be required to purchase the notes as agreed. The bank subsequently wrote, on August 9th, to the petitioner that it had exchanged the new notes for those issued on July 31st, 1931, and that the last notes were to be held according to the terms of the agreement set forth in the bank's letter of July 31st, 1931.

When the last serial notes of the company were handed to the petitioner, he was induced to accept them upon similar representations of the safety, solvency, and excellent financial condition of the bank and the company, as had characterized their former transactions, except that during the month of July and August, 1932, the bank

not only knew that it was hopelessly insolvent, but was also aware that the closing of the bank on August 11th, 1932, and its being placed in the hands of the bank commissioner, were inevitable.

While the bill of complaint does charge that the recited representations made in July, 1929, did induce him, in the first instance, to invest the sum of $120,000 in the collateral trust notes of the Park Mortgage & Ground Rent Company, the bill does not allege that the representations so made were false. The accusations of false representations and deceit begin with the negotiations between the parties in February, 1930, and are repeated with respect to every subsequent transaction for the renewal of the investment by the petitioner, but these allegations must either be admitted or be by the petitioner proved before they may be considered. The averments were not admitted and the testimony in the cause is insufficient to establish these charges of misrepresentation and fraud, except with reference to the transactions during the months of July and August, 1932, during which months the chancellor found the bank to have been insolvent. It further appears that the Park Mortgage & Ground Rent Company is insolvent, and is in the hands of a receiver, but the beginning of its state of insolvency does not appear on the record. The financial relation between the two corporations is, however, shown by the testimony to have been so close, and their affairs so interlocked and dependent, that it may be assumed that their insolvencies were coincident.

It should further be noted that the Maryland Trust Company, the trustee for the benefit of the holders of the collateral trust notes issued by the Park Mortgage & Ground Rent Company, upon default of the mortgagor, proceeded to liquidate the securities granted and assigned to it in trust, and had made a partial distribution, out of which the petitioner had received the sum of $12,000 before he began the pending proceedings; and, since these proceedings, the trustee, with the consent of the chancellor and without prejudice to any of the rights of the

petitioner with regard to the matters presented by his bill of complaint, has paid to the petitioner his share of two additional distributions or $24,000. The petitioner has, therefore, received, from the trustee of the obligor of the three notes of $120,000, three payments which aggregate $36,000.

The proof, therefore, is that on July 29th, 1929, at the suggestion of the bank, and upon certain representations then made that are neither charged by the bill nor proved by the evidence to have been false, and also upon the undertaking of the bank to buy of the petitioner, at their face value and upon request and notice, the collateral trust notes to be bought by the petitioner of the company, the petitioner was induced to buy certain collateral trust notes in the sum of $120,000, as a safe and desirable investment for his funds then on deposit in the savings funds of the bank. The purchase and sale of the notes was fully consummated. The buyer paid for the notes, and the price was paid to the company, which deposited the sum paid to the company's corporate checking account in the bank, and thereupon the company issued to the buyer its three collateral trust notes, and gave its check to the petitioner for $3,600, the interest in advance for six months, and its other check to the petitioner for $2,400, which was the bonus or commissions for two years at the rate of one per centum annually, on the understanding that the maturity of the note, which was drawn for one year, would be extended to an additional year, subject to the described right of the petitioner to require the bank to purchase the notes. On no legal nor equitable principle could he have demanded and obtained of the company the money he paid except according to the tenor of the terms of the purchase and, *a fortiori*, no trust *ex maleficio* arose, since, on the proof on this record, the money of the petitioner was not obtained by deceit, misrepresentation, or fraud.

The next transaction was six months later when the first accusation of misrepresentation is found in the bill of complaint. The testimony on the record is that on

July 31st, 1929, $120,000 of the petitioner's money was paid to the company for value, and by it deposited in the Park Bank to the credit of the company, but how long this money remained in the company's account, and when it was used and withdrawn, do not appear, but no contention is advanced that at the close of the next six months the deposit remained, in whole or in part, in any funds of the company on deposit to its credit at the Park Bank or elsewhere. Furthermore, in the transaction of February 2nd, 1930, and all the subsequent ones, no money passed from the petitioner. What he did in every one of these negotiations was to renew the original loan for a specific period by accepting renewal notes of the company, and a renewed promise of the bank to buy the notes on petitioner's request and thirty days' notice. There was no fresh deposit, and the only money required and used for these periodic and successive negotiations was the prompt payment of the interest by the company to the petitioner, and a bonus or commission for the renewal of the loans in the sum of $4,800. So, in final analysis, in the transactions in July and August, 1932, the parties simply renewed their respective obligations, without any fund passing from the petitioner either to the company or to the bank, so there was no *res* in existence upon which any trust could attach for the benefit of the petitioner. It is undoubtedly true that the consent of the petitioner to the renewal of the investment in the collateral trust notes in July and August, 1932, was obtained by the grossly false and fraudulent misrepresentations of the bank in regard to the solvency and excellent financial condition of the company and the bank. These misrepresentations, and the failure of the company to pay as it promised in the notes and the bank as it promised in its agreement, give the petitioner a right of action against the bank, but not a preference or priority in the funds of the bank, when none of such funds had been acquired by the bank as a result of the fraud practiced upon the petitioner by the bank after July 31st, 1929, and particularly in July and August of 1932. After July 31st, 1929, the right

of the petitioner as a depositor in the bank ceased, and the petitioner's sole subsequent right against the bank is on the contract of the bank to purchase of the petitioner the collateral trust notes of the company at their face value on the demand of the petitioner, and a notice of thirty days of the petitioner's intention to enforce this right. It is quite evident that the petitioner has no claim of preference or priority against the assets of the Park Bank, and it will be unnecessary to discuss other questions on the record.

*Decree affirmed, with costs to the appellee.*